William NABORS, Estevan King, and David Cing, Plaintiffs-Appellants,

v.

Herman MANGLONA, Manuel Villagomez, Howard Macaranas, and Ignacio Quichocho, Defendants-Appellees.

No. 86–1951.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 6, 1986.

Decided Oct. 8, 1987.

---

James S. Sirok, Saipan, for plaintiffs-appellants.

Robert O'Connor, Saipan, for defendants-appellees.

Before NELSON, REINHARDT and WIGGINS, Circuit Judges.

REINHARDT, Circuit Judge:

Three election candidates contest the results of the 1985 general election held in the Commonwealth of the Northern Mariana Islands. The district court dismissed their complaint for failure to state a claim. While it appears that the election involved a scheme to subvert one of the hallmarks of a representative democracy, secret ballot voting—and possibly even to coerce or bribe voters—for the reasons stated below, we hold that we no longer have jurisdiction to rule on the matter.

## I. Facts

The island of Tinian is a part of the newly founded Commonwealth of the Northern Mariana Islands, which was created from part of a trust territory administered by the United States under United Nations mandate from 1947 until last year.[1] The Commonwealth reflects the influence of American administration in many ways, including its parallels to our American political system. It has Democrats and Republicans, who vie for seats in the Commonwealth's Senate and House of Representatives in elections held in the early part of November. As with many experiments in self-government, such elections are sometimes not entirely free of attempts to subvert the democratic process.

William Nabors, Estevan King, James Mendiola and David Cing (collectively Nabors[2]) were non-incumbent candidates in the November 3, 1985, election held on Tinian for, respectively, a seat in the Commonwealth's House, two seats in its Senate, and Mayor of Tinian. All belong to the same political party. Their opponents, Howard Macaranas, Manuel Villagomez, Herman Manglona and Ignacio Quichocho (collectively Manglona), are members of the opposing party, which holds a majority of the seats in the Commonwealth Legislature. Manglona and his colleagues were initially declared victorious by margins ranging from 28 to 43 votes out of the 490 or so ballots cast.

Nabors filed an election contest with the Commonwealth's Board of Elections pursuant to the Election Act of 1977, 1 C.M.C §§ 6411–6428, and disputed the validity of 85 ballots. Such contests are provided for by section 6421 of the Act. In his complaint, Nabors claimed that Manglona and his party's representatives intimidated, coerced and bribed numerous voters to ob-

tain their votes. In addition, he alleged that Manglona used a scheme to verify that these voters had actually voted the straight majority party ticket. Under the alleged scheme, voters were directed to mark their ballots by entering a unique predesignated code name on the write-in line for the office of Washington representative, for which no majority party candidate was running; the marked ballots were then verified by a senator, a member of the majority party, who was present during the ballot tabulation and could determine whether a particular voter had voted the straight party line. Nabors asserted that this ballot-marking scheme violated 1 C.M.C § 6411(a), which states that every voter "has the right to cast a secret ballot in private," as well as the Commonwealth Constitution and Board of Elections regulations. He also argued that because the marked ballots violated the secrecy requirement, they were illegal and should not be counted. See 1 C.M.C. § 6421.

The Board issued findings of fact and conclusions of law after hearing six days of testimony. Among other things, the Board made the following findings: (1) as many as 15 to 18 voters had attended a meeting in the office of a majority party senator on the morning of the election; (2) the senator established code names for numerous voters, which were to be entered on their ballots; (3) voters voluntarily entered code names such as "Rambo," "Bimbo," "RM Dela Cruz No. 1" and "RM Dela Cruz No. 15" on their ballots in order to reveal their identities; (4) of the 85 ballots that contained write-in names, 73 were cast for the straight majority party ticket; and (5) a majority party senator was present when the votes were tabulated and wrote on a pad each time a write-in name for the position of Washington representative was an-

---

1. In 1975 the United States and the people of the Marianas signed the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America, which created for the Marianas a commonwealth relationship similar to the one that Puerto Rico has with the United States. 90 Stat. 263 (1975). The Covenant did not go into full effect until November 3, 1986, when President Reagan signed a proclamation formally

dissolving the United Nations trusteeship. Proclamation No. 5564, 51 Fed. Reg. 40,399 (1986).

2. While all four candidates challenged their election results before the Commonwealth Board of Elections, only Nabors, King and Cing pursued judicial review. We use the name Nabors to refer to all four or only the appealing three depending on the context of the reference.

nounced. However, the Board also found that all of these voters would have voted for the same person even in the absence of the scheme providing for the entry of code names on their ballots, and that neither Manglona nor his party's representatives harassed, coerced or bribed voters. In essence, the Board found facts amounting to a ballot-marking scheme but not a scheme to encourage or cause a change in anyone's vote. The Board concluded that Nabors failed to establish a violation on any of the grounds for contesting an election specified in section 6421. It, therefore, confirmed Manglona and his colleagues as winners of the election.

Nabors then filed an election complaint in the Commonwealth Trial Court pursuant to 1 C.M.C. § 6430 of the 1977 Elections Act. His complaint was substantially similar to the one brought before the Board, with the exception of his dropping the allegations of voter coercion and bribery. In this complaint, Nabors contended only that the ballot-marking scheme violated the right to secret ballot elections of section 6411(a) and the Commonwealth Constitution, and that the ballots were therefore illegal within the meaning of section 6421. Manglona filed a motion to dismiss on the ground that the complaint did not fall within one of the four reasons specified in that section. The trial court agreed and granted Manglona's motion to dismiss.

Nabors then sought review in the Appellate Division of the District Court for the Northern Mariana Islands pursuant to 1 C.M.C. § 6431 and 48 U.S.C. § 1694b (Supp. 1987). The three-judge panel evidently read the factual findings of the Elections Board as evidencing a ballot-marking scheme, but nevertheless held that Nabors failed to state a cause of action. The court held that the votes were not "illegal" within the meaning of section 6421 because voters may waive their right to secret ballot. The appellate panel added, however: "This opinion should not be read to imply that this Court condones the scheme instituted on Tinian. We find it extremely disturbing that in this day and age the democratic process can be attacked as it was on Tinian leaving the unsuccessful candidates with no recourse in the courts." Nabors

filed a timely notice of appeal to this court, which, pursuant to 48 U.S.C. § 1694c(b), sits as the court of final review for the Commonwealth.

## II. *Discussion*

■ Like the appellate division, we do not wish our opinion to be read as suggesting a lack of concern over the ballot-marking scheme described here. A system of placing identifying marks on voters' ballots for the purpose of monitoring their electoral choices is repugnant to the democratic principles upon which the United States, the Commonwealth, and our common system of secret ballot elections are based. There can be absolutely no justification for such a scheme. It constitutes a direct subversion of the freedom to vote as one chooses.

Knowledge by the individual voter that his ballot choices can be monitored by others interferes with his fundamental electoral rights, and in many cases would inevitably influence his choice of candidates. Moreover, when some voters mark their ballots in accordance with a scheme that reveals their identity, the rights of others who refuse to participate in the scheme are affected. The degree of secrecy as to the latter group's electoral conduct is reduced for at least three reasons. One, those conducting the scheme know that particular individuals refused to go along with their identification plan; two, the schemers may well surmise, rightly or wrongly, that those refusing to go along are casting hostile votes; and three, the number of voters who cast unidentifiable ballots is substantially reduced and it is thus easier to calculate the probabilities as to how those not participating in the scheme voted. Accordingly, we have serious doubts regarding the appellate division's conclusion that the challenged ballots were not illegal. Nevertheless, like the appellate panel, we find that we cannot address Nabors's claim—but for a different reason. We conclude that we lack jurisdiction to do so.

In April 1986, the Fifth Commonwealth Legislature—the one elected in the 1985 general election that is challenged here—passed legislation that reallocated jurisdiction over challenges to Commonwealth elec-

tions and the ballots cast in those elections. Act of April 9, 1986, Pub.L. No. 5–7.[3] The express purposes of those amendments to the Election Act were:

> To affirm the final jurisdiction of the Board of Elections to decide the validity of questionable ballots, to maintain the jurisdiction of each house of the Legislature to be the final judge of the election and qualifications of its members, to amend 1 CMC Article 2 to provide that the Board of Elections will no longer have jurisdiction to hear election contests....

*Id.* (Preamble). By its enactment of Public Law 5–7, the legislature apparently fully intended to preclude our review of Nabors's challenge, and it has succeeded in doing so.

■ When Nabors filed his election challenge, the Elections Act provided that election contests arising under section 6421 were to be brought before the Board of Elections, and that the Board's decision could be reviewed by the courts, including this one. That is the procedure that Nabors followed. However, Public Law 5–7, enacted in April 1986, removed from the Board all authority to hear section 6421 election contests and from the courts all authority to review them; instead, the amended Act requires that election contests for seats in either house of the legislature be brought directly before that house, and that they be filed by the thirtieth day after the declaration of official results or inauguration day, whichever is later. Pub.L. No. 5–7, § 4; 1 C.M.C. § 6423(a).[4] Public Law 5–7 also provides that the amendments apply retroactively to all pending election contests, and that any contest that is "transferred" as a result of the amendments from one forum to another shall not be subject to the specified filing deadlines. Pub.L. No. 5–7, §§ 11, 12.

■ The 1986 amendments to the Election Act were signed into law on April 9, 1986. Nabors's suit was pending at that time; it had not been reduced to final judgment. In fact, it was on the very day the bill was signed that Nabors submitted his notice of appeal to this court. There is still no final judgment in his case.[5] Thus the 1986 amendments to the Election Act apply to Nabors's pending contest of the election of November 3, 1985.

In addition to providing that section 6421 disputes over legislative elections would thereafter be resolved directly in the legislature, Public Law 5–7 also specifically repealed the provisions of the 1977 Election Act that provided for judicial review of election contest decisions. Pub.L. No. 5–7, § 10 (repealing *inter alia* 1 C.M.C. §§ 6430–6432). It is clear that under Public Law 5–7 election contests involving legislative races must be brought before the legislature, that courts cannot review the legislature's decisions regarding those contests, and that such of them as were pending before the courts when the 1986 Election Act Amendments were adopted must

---

**3.** Nabors does not raise the point that Manglona, Macaranas and Villagomez were members of the legislature that enacted Public Law 5–7. Nor does he allege that any of those defendants voted to enact that law. Whatever the facts, no challenge is made to the statute on the ground that it was enacted improperly or that a person who voted for it was not entitled to do so, and we do not consider any such issue here.

**4.** At oral argument Nabors's counsel stated that our decision need address only the legislative contests and that appellants were not requesting a separate resolution of any issue relating to the remaining office. In view of the jurisdictional resolution we reach regarding the legislative contests, we do not consider any questions relating to the election of Mayor of Tinian. We note, however, that under Public Law 5–7, the Commonwealth Trial Court now has sole authority to hear all election contests other than those involving seats in the Legislature, Pub.L. No. 5–7, § 4, 1 C.M.C. § 6423(a), and that under the statute the trial court's decisions are final and unappealable. Pub.L. No. 5–7, § 6; 1 C.M.C. § 6425(c).

**5.** Section 11 of Public Law 5–7 makes the 1986 amendments applicable "to any election contest which has not been reduced to final judgment on the effective date of this act." Pub.L. No. 5–7, § 11. While under 28 U.S.C. § 1291 (1966 & Supp.1987), a district court judgment must be final before a court of appeals has jurisdiction to hear it, finality of judgment for purposes of appellate jurisdiction is not synonymous with finality for purposes of applying statutes retroactively. *See In Re Lara,* 731 F.2d 1455, 1459 n. 5 (9th Cir.1984). In the latter context, judgment on an action is not final until the appellate process has been exhausted.

be transferred to the legislature if the persons who filed them wish to pursue them further.

The only remaining question is whether the legislature's assumption of final authority over "election contests," and the concomitant absence of judicial review, is constitutional. This question is readily resolved. The absolute authority of the legislature to decide upon the seating of its members, and to determine whether or not the courts shall play any role in that process, is expressly set forth in the Marianas' constitution: "Each house of the legislature shall be the final judge of the election and qualifications of its members and the legislature may vest in the court the jurisdiction to determine contested elections of its members." CNMI Const. art. II, § 14(a). While the legislature *may* authorize the courts to review legislative elections and determine their outcomes, nothing requires it to grant courts such jurisdiction. *Id.; see* Analysis of Const. CNMI 55–56 (Dec. 6, 1976). As for retroactive application to pending election contests, the 1986 Amendments do not preclude any person from pursuing a pending challenge. They merely provide for a transfer of the proceeding to a different forum. We find that Nabors has raised no valid constitutional objection to Public Law 5–7. Thus, we are obligated to apply that statute here.[6]

Nabors challenges the results of three legislative races in the November 3, 1985 general election—for a seat in the House of Representatives and two seats in the Senate. Under the Election Act as amended, he must contest the House elec-

tion before the House and the Senate elections before the Senate. No court has jurisdiction to hear a legislative election contest or an appeal from one. Because Nabors's legislative contest was pending in the courts at the time of passage of Public Law 5–7, it must be transferred to the legislature, if he wishes to pursue it further.[7] The decisions below are ordered vacated.

DISMISSED FOR LACK OF JURISDICTION

---

6. We note that Public Law 5–7 provides for procedural safeguards in legislative contests. The appropriate house may decide a contest only after a credentials committee has afforded the protestant a full hearing, with the opportunity for representation by counsel, and has made a recommendation to the full house. Pub.L. No. 5–7, § 4; 1 C.M.C. § 6423(a).

7. The 1986 Amendments also make substantive changes in the definition of an "election contest." The scope of section 6421 is narrowed considerably. We need not consider, however, whether under the 1986 Amendments Nabors's challenge still qualifies as an "election contest" —although we note that permitting an observer

who is able to determine who voted for whom to participate in the vote count would appear to constitute an "error" in the "conduct of election" under section 6421(d), or an "irregularity or improper conduct in the proceedings of the election" under section 6422(a). We are aware that there is another section of the Election Act that deals with "ballot irregularities" and establishes a different procedure for resolving such matters. Regardless which section of the Election Act Nabors's challenge now falls under, we do not have jurisdiction. *See Manglona v. Benavente,* 829 F.2d 899 (9th Cir.1987), filed concurrently with this opinion.