**SOCIALIST WORKERS PARTY; George Richard McBride; James Kenneth Gotesky; Elvena Elizabeth Brady; Cleve Andrew Pulley; Toba Leah Singer, Plaintiffs–Appellants,**

v.

**Ken HECHLER, in his official capacities as Secretary of State of West Virginia and Member, State Election Commission Office of Secretary of State; Allan Hammock, in his official capacity as Member, State Election Commission Office of Secretary of State; Barbara Ruley, in her official capacity as Member, State Election Commission Office of Secretary of State; Ben Bryant, in his official capacity as Member, State Election Commission Office of Secretary of State; Perry Reed, Defendants–Appellees.**

No. 88–2199.

United States Court of Appeals, Fourth Circuit.

Argued May 13, 1989.

Decided Nov. 29, 1989.

Rehearing and Rehearing In Banc Denied Dec. 28, 1989.

Robert Milton Bastress, Jr., Morgantown, W.Va., for plaintiffs-appellants.

Robert Eugene Wilkinson, Sp. Asst. Atty. Gen., for defendants-appellees.

Before HALL and WILKINSON, Circuit Judges, and WILLIAMS, Senior District Judge for the Western District of Virginia, sitting by designation.

GLEN M. WILLIAMS, Senior District Judge:

Appellants, the Socialist Workers Party and five individuals, brought suit against the members of the West Virginia State Election Commission alleging that certain provisions of the state's election laws are unconstitutional. Specifically, they object to the provision that individuals who sign nominating petitions for minor party candidates thereby lose their right to vote in the primary election; the requirement that minor party candidates must file their certifi-cates of candidacy a month before the primary and their nominating petitions the day before the primary; the requirement that a candidate who cannot afford a filing fee submit a petition in lieu of the fee separate from the nominating petition; and finally the requirement that persons who sign nominating petitions state that they "desire to vote" for the candidate named in the petition.

The district court, in a lengthy and detailed opinion, 696 F.Supp. 190, upheld all of the challenged provisions, and the plaintiffs now bring this appeal.

## I.

Challenges by third parties and independent candidates of various state regulatory schemes are no longer novel. The Supreme Court has held that voters have the right under the First and Fourteenth Amendments to cast their ballots effectively, *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968) (Black, J.), and that "[t]he right to form a party ... means little if [it] can be kept off an election ballot and thus denied an equal opportunity to win votes." *Id.* at 31, 89 S.Ct. at 10. The exclusion of all but major-party candidates from the ballot heavily burdens the right to vote since all voters want to be able to vote for someone who reflects their views on the issues of the day. *Id.; Lubin v. Panish,* 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974). However, these general principles are not to be interpreted as an open sesame for minor parties and individuals who want to appear on the ballot with the major candidates.

> The State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates.

*Anderson v. Celebrezze,* 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 1570 n. 9, 75 L.Ed.2d 547 (1983); *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).

Because of the wide variation in the approaches of different states to the problem of ballot access, the Supreme Court in *Anderson* laid down a balancing test to determine the constitutional validity of the various state schemes. A court

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional. The results of this evaluation will not be automatic; as we have recognized, there is "no substitute for the hard judgments that must be made."

460 U.S. at 789–90, 103 S.Ct. at 1570 (citations omitted).

## II.

■ The district court proceeded to examine the challenged provisions of West Virginia's elections laws in light of the *Anderson* standard. It found that the statute, W.Va.Code § 3–5–23(c) and (d), which forces voters to choose between signing a nominating petition and voting in the primary election was proper, citing *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), in which the Supreme Court sustained a similar provision of the Texas election code on the grounds that there is "nothing invidious in disqualifying those who have voted at a party primary from signing petitions for another party seeking ballot position for its candidates for the same offices." *Id.* at 786, 94 S.Ct. at 1308.

Plaintiffs, however, point to a difference between the West Virginia scheme and the Texas statute upheld by the Supreme Court in *White*. In Texas, a third party which fails to garner enough support at its nominating convention on primary day "may make up the shortage and win ballot positions by circulating petitions for signature for a period of 55 days beginning after the primary and ending 120 days prior to the general election." *Id.* at 784, 94 S.Ct. at 1307. It is the lack of such a second chance in West Virginia which the plaintiffs see as "impos[ing] a substantial, overbroad, and unnecessary burden" on their access to the ballot.

The plaintiffs complain that the lack of a post-primary makeup period for gathering signatures burdens them in two ways: first, contrary to the district court's supposition, the fact that only about 50% of the West Virginia electorate participates in the primary does not automatically mean that the other 50% will be available for signing nominating petitions because many of those people will not be willing to abandon their right to vote in the primary until the last minute, if at all. Second, the act of signing a nominating petition for a candidate in one race results in the loss of the right to vote on primary day in other races as well. This places a substantial burden on minor parties and independent candidates which is not balanced, according to the plaintiffs, by any corresponding state interest.

This argument is substantially undermined by a close look at the relevant precedents. The situation which obtained in *American Party of Texas v. White* is not so simple as plaintiffs suggest. There, Texas election laws provided the following system for candidates whose party polled less than two percent of the vote at the preceding election to get on the ballot: first, the party was required to hold precinct, county, and state conventions to nominate candidates and had to evidence support by persons numbering at least one percent of the total vote cast for governor at the preceding general election, by preparing a list of the qualified voters and sending it to the Secretary of State within twenty days. 415 U.S. at 777, 94 S.Ct. at 1304. If this were insufficient, only then would the petition process kick in. The

party might gather signatures from qualified voters who had not participated in the primary. They must, however, have taken an oath stating, *inter alia*, that they were qualified voters who have not participated in the primary.

The West Virginia Supreme Court, contrasting the Texas scheme with their own, stated, "We cannot help but believe that our straightforward signature petition standard is much less burdensome than the Texas precinct convention and second chance scheme." *West Virginia Libertarian Party v. Manchin*, 270 S.E.2d 634, 646 (W.Va.1980).

On balance, we agree with the West Virginia Supreme Court and the district court. The state interest in regulating the number of candidates on the ballot in order to avoid voter confusion, whether it be described as "important," *Jenness v. Fortson*, 403 U.S. at 442, 91 S.Ct. at 1976, or "compelling," *American Party of Texas v. White*, 415 U.S. at 782 n. 14, 94 S.Ct. at 1307 n. 14, is "generally sufficient to justify reasonable nondiscriminatory restrictions." *Anderson v. Celebrezze*, 460 U.S. at 788, 103 S.Ct. at 1569. It is not enough for the plaintiffs to make a limited comparison of the West Virginia scheme with the Texas scheme upheld by the Supreme Court in *American Party*, find some way in which the West Virginia plan is more restrictive, and therefore expect this court to declare it unconstitutional. The Supreme Court did not declare the Texas plan to be a paradigm,

deviations from which are impermissible; it simply found it, taken as a whole, to be within the bounds of the Constitution. Although it might be somewhat easier to collect signatures after the primary, as in Texas, rather than before, minor parties under the West Virginia plan are spared the necessity of having Texas-style precinct, county, and state conventions, a not inconsiderable burden in itself.

This view is bolstered by the holding in *Jenness v. Fortson*. There, the Supreme Court upheld a Georgia scheme very similar to West Virginia's. Georgia allowed the candidate of minor parties to win a place on the ballot by filing a nominating petition signed by *five* percent of persons eligible to vote in the last election for the particular office. 403 U.S. at 433, 91 S.Ct. at 1971. The candidate was allowed 180 days to gather the signatures, and the petition had to be filed by the same deadline as a candidate filing for a party primary. Although Georgia placed fewer restrictions on the right of an individual to sign a nominating petition—for instance, a person who previously signed a petition could vote in the primary—West Virginia's restrictions are balanced by the one percent requirement, as opposed to Georgia's five percent, and by the fact that there is no restriction in West Virginia on the length of time spent on gathering the signatures, while Georgia required this to be done no more than 180 days before the petitions were filed. *Id.*[1] To reiterate, we agree

---

1. *Cf. Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968), in which the Supreme Court struck down Ohio's elections laws, which in combination made it "virtually impossible for a new political party, even though it ha[d] hundreds of thousands of members, or an old party, which ha[d] a very small number of members, to be placed on the state ballot." *Id.* at 24, 89 S.Ct. at 7. The Ohio statutory scheme was summarized by Mr. Justice Douglas in a concurring opinion as follows:

> Ohio, through an entangling web of election laws, has effectively foreclosed its presidential ballot to all but Republicans and Democrats. It has done so initially by abolishing write-in votes so as to restrict candidacy to names on the ballot; it has eliminated all independent candidates through a requirement that nominees enjoy the endorsement of a political party; it has defined "political party" in such a

way as to exclude virtually all but the two major parties.

> A candidate who seeks a place on the Ohio presidential ballot must first compile signatures of qualified voters who total at least 15% of those voting in the last gubernatorial election. In this election year, 1968, a candidate would need 433,100 such signatures. Moreover, he must succeed in gathering them long before the general election, since a nominating petition must be filed with the Secretary of State in February. That is not all: having compiled those signatures, the candidate must further show that he has received the nomination of a group which qualifies as a "political party" within the meaning of Ohio law. It is not enough to be an independent candidate for President with wide popular support; one must trace his support to a political party.

that, on balance, West Virginia's scheme is no more burdensome, and in some important respects is less burdensome, than those of other states which have been found constitutional.

The district court also affirmed § 3–5–23(c), which requires the number of signatures on a nominating petition to be, at a minimum, one percent of the votes cast for the office at the previous general election. Not only have one percent requirements been upheld by the Supreme Court, see *Munro v. Socialist Workers Party,* 479 U.S. 189, 198, 107 S.Ct. 533, 539, 93 L.Ed.2d 499 (1986); *American Party of Texas v. White,* 415 U.S. at 783, 94 S.Ct. at 1307, but as noted earlier, Georgia's five percent requirement as well. *Jenness v. Fortson,* 403 U.S. at 442, 91 S.Ct. at 1976. The plaintiffs do not challenge the one percent requirement on appeal, but do say that combined with certain provisions of § 3–5–8(a), it violates Equal Protection and First Amendment rights. This last code section provides that indigent political candidates may obtain a place on the ballot without paying the statutory filing fee if, after filing an oath that they are unable to pay, they submit "in-lieu-of-filing-fee petition forms" with the number of signatures equaling four times the dollar amount of the statutory fee. It also provides that none of the signatures gathered on this petition can be counted towards meeting the nominating petition minimum. In other words, the signatures obtained for one petition cannot take the place of signatures on the other, although the same people can sign both.

The appellants' position is that if they have proved their "seriousness" and a minimum level of support once, it is an unconstitutional burden on their political rights to make them prove the same thing, in effect, in a second petition.

The district court, in holding that the statute was constitutional, pointed out that the actual number of signatures required was small. It noted that plaintiffs McBride and Gotesky would be required to gather 3,580 signatures apiece, and plaintiff Brady only 1,728. The court, in applying the *Anderson* balancing test, found that the burden that obtaining this number of signatures imposed was modest, especially in comparison with the requirements of the in-lieu-of-filing-fee schemes of other states which have been upheld. Furthermore, those who sign this petition do not forfeit the right to vote in the primary, thus doubling the number of potential signatories. Finally, as noted earlier, although signatures gathered on the nominating petition cannot be counted towards meeting the in-lieu-of-filing-fee petition requirements, the difficulty of finding more signatories may easily be overcome by having the same people sign both petitions. Surely no one who would sign a nominating certificate would have any objection to signing an in-lieu-of-filing-fee petition. Therefore, the burden alleged by plaintiffs would appear to be *de minimis.* Thus there was no error in the district court's holding.

To qualify as a party, a group of electors must participate in the state primary, electing one of its members from each county ward or precinct to a county general committee; two of its members from each congressional district to a state central committee; and some of its members as delegates and alternates to a national convention. Moreover, those of its members who seek a place on the primary ballot as candidates for positions as central committeemen and national convention delegates must demonstrate that they did not vote in any other party primary during the preceding four years; and must present petitions of endorsement on their behalf by anywhere from five to 1,000 voters who likewise failed to vote for any other party in the last preceding primary. Thus, to qualify as a third party, a group must first erect elaborate political machinery, and then rest it upon the ranks of those who have proved both unwilling and unable to vote.
*Id.* at 35–37, 89 S.Ct. at 12–14 (footnotes omitted).

The distinctions between the highly restrictive Ohio scheme and West Virginia's are far-reaching. Ohio ruled out independent candidacies; West Virginia does not. The requirements for qualifying as a political party, furthermore, were not only onerous but were virtually impossible for a small party to fulfill. The Supreme Court had little difficulty in finding such an electoral scheme unconstitutional. There is nothing about West Virginia's elections laws that creates such a crushing burden on minor parties.

### III.

The plaintiffs allege that the requirement contained in § 3–5–23(d), that a person who signs a nominating certificate must declare that "he desires to vote" for the named candidate, is unconstitutional. The district court, reading the subsection as a whole, interpreted this provision only as intending to insure that the subscribers realize that they are giving up their vote in the primary. We respectfully disagree.

Section 3–5–23(d) provides that "the content [of nominating certificates] shall include the language to be used in giving written and oral notice to each voter that signing of the nominating certificate forfeits that voter's right to vote in the corresponding primary election." This provision is entirely separate and apart from the requirement that subscribers state their "desire to vote" for the candidate. In our view there can be only one interpretation of this language in the mind of a subscriber: that since he has been told separately that he cannot vote in the primary, the declaration of his intention to support the candidate can only apply to the general election.

Under West Virginia law, the signature of a voter on a nominating certificate is essentially another way of voting in the primary. The West Virginia Supreme Court of Appeals has held that "[although] the act of signing the [nominating] certificate does not constitute a vote in the usual sense, nor is the certificate a ballot ... such act is so analogous to the voting process that it is entitled to the same consideration as a vote by ballot." *State ex rel. Daily Gazette Co. v. Bailey*, 152 W.Va. 521, 164 S.E.2d 414, 417 (1968). The same case also holds that signers of nominating certificates are "affirmatively making a nomination, which, if done in accordance with the appropriate statute, would succeed in placing their candidate on the ballot in the general election." 164 S.E.2d at 417.

Therefore, it seems that, in West Virginia, only those people who are members of a minority party, or of a group which has not yet become a party, are required to state as part of the nominating process that it is their intention to support a candidate in the general election. Thus, appellants object that their right to cast a secret ballot is violated by the desire-to-vote provision and that they are being denied equal protection of the law under the Fourteenth Amendment.

### A. Secret Ballot

■ For a democracy to function, it is absolutely vital that citizens be free to vote for the candidate they choose. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964). Although historically the "viva voce" (with the living mouth) election was common in the United States,[2] in this century most states, including West Virginia, have embraced the secret ballot, either statutorily or constitutionally, as an indispensable means of holding elections free from "violence, intimidation, bribery and other corrupt practices" which so often accompany elections where secrecy is not preserved. *Anderson v. Mills*, 664 F.2d 600, 608 (6th Cir.1981). *See also Taylor v. Bleakley*, 55 Kan. 1, 39 P. 1045 (1895). In the recent case of *Nabors v. Manglona*, 829 F.2d 902 (9th Cir.1987), for example, it was alleged that the defendants had "intimidated, coerced, and bribed numerous voters to obtain their votes," and that to insure the success of this alleged fraud, had ordered the voters to mark their ballots with secret code names. *Id.* at 904.

---

**2.** "The right of a qualified citizen to vote as he pleases is certainly a fundamental right and is a basic concept in our system of government. Public voting subjected even the most hardy to pressure and also to violence. But it was never thought, or suggested, that public voting violated constitutional rights. The secret ballot does not seem to have appeared in this country until February, 1888, when the newly-devised Australian [ballot] system was adopted for municipal elections in Louisville, Kentucky." *Barsky v. United States*, 83 U.S.App.D.C. 127, 167 F.2d 241, 249 n. 28 (1948).

Although there have been no allegations of fraud in the instant case, the secret ballot also acts to protect another vital component of a democratic election: the ability to cast a ballot free from "scorn and ridicule." *Anderson v. Mills*, 664 F.2d at 608; *Taylor v. Bleakley*, 39 P. at 1049. In holding the desire-to-vote provision in Kentucky's election laws invalid, the Sixth Circuit noted that:

> The declaration operates to discourage citizens from participation in the electoral process simply because they do not wish people to know how they will vote. Such a revelation invokes the fears sought to be quelled by the secrecy of voting laws in this country, and subject an elector to the pressure of his neighbors, his employers, and social peers.

664 F.2d at 608–09.

Moreover, we believe that the effect of such a revelation can be substantial, in that it will discourage people from joining unpopular or controversial parties or causes.

West Virginia has enacted a statute, W.Va.Code § 3–1–4, providing that voters in all elections shall have the choice of voting with either an "open, sealed, or secret ballot." [3] Given the West Virginia Supreme Court of Appeals' own holding that the act of signing a nominating certificate is analogous to casting a ballot, this court can only conclude that forcing individuals to state that they desire to vote for a candidate before they can sign his nominating certificate is a clear infringement of their right to keep their vote and their political preference secret.[4]

### B. Equal Protection

The Constitution of the United States, Article I, § 4, states that "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators."

The Supreme Court has said that

> the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as it may deem proper, provided of course, no discrimination is made between individuals, in violation of the Federal Constitution.

*Carrington v. Rash*, 380 U.S. 89, 91, 85 S.Ct. 775, 777, 13 L.Ed.2d 675 (1964), *quoting Pope v. Williams*, 193 U.S. 621, 623, 24 S.Ct. 573, 574, 48 L.Ed. 817 (1903).

In other words, the power of the states to determine the manner of holding elections is limited by the Equal Protection Clause of the Fourteenth Amendment. Since it is very clear that West Virginia is discriminating between those of its citizens who vote in primary elections to choose candidates for major parties, and those who choose to exercise their primary franchise through nominating certificates, the injuries to the appellants must be weighed against the justification offered by the state under the *Anderson v. Celebrezze* balancing test.

**3.** It has been recognized that in some instances, such as when illiterate or blind voters need assistance in voting, the right to a secret ballot may be waived. *See, e.g., United States v. Executive Committee of Democratic Party of Greene County, Alabama*, 254 F.Supp. 543, 546 (N.D. Ala.1966).

**4.** The appellees suggest that because the West Virginia Supreme Court in *Bailey* ruled that the names of subscribers were secret, there is, in effect, no *public* declaration of voting preference. Although the *Bailey* court did say that names of subscribers would be available only to persons with a "sufficient interest," 164 S.E.2d at 418–19, it stopped short of saying that the names would not be available under any circumstances whatever. Furthermore, the dissent stated:

> In casting ... a vote in a primary election, not even the election officials know how the voter votes. Any person soliciting signatures for the purpose of nominating a candidate by [petition] of necessity knows exactly whose names are contained thereon. Every signer on every petition after the first one has an opportunity to look at the other names on the petition, the secretary of state and all of his staff of necessity may examine the signatures, as well as every clerk of every county court of this state and all of his staff have the right to examine the signatures that are alleged to be those of residents of the particular county. *Id.* at 421 (Browning, J., dissenting).

It is obvious that compelling disclosure of a person's intention to vote can have a substantial effect on the ability of small political groups to compete on the electoral battleground. A small party, already at a disadvantage to the organized battalions of the major parties and large pressure groups, must overcome three distinct hurdles due to the desire-to-vote requirement. First, because most people want to keep their vote secret, many potential subscribers will be reluctant to openly declare their voting preference in a nominating certificate. Second, many people will not have made up their minds early in an election year whom they will vote for in the fall. At the time the nominating certificates are being circulated, then, these people could not honestly say for whom they would like to vote. Furthermore, anyone even remotely connected with politics knows that voters have a right to change their minds and often do so as an election gets closer. Third, some individuals who have made up their minds, and who would ordinarily have no objection to stating their preferences, might be put off by the possible reaction to associating themselves with the more unpopular political groups.

The Sixth Circuit neatly summarized the Equal Protection difficulties of Kentucky's desire-to-vote requirement:

> It is only those electors wishing to sign a petition who must declare their desire to vote for a specific individual. Electors who support other candidates have to make no such public declaration. The chilling effect that such a practice has on associational and voting rights is obvious. The voting citizen must decide whether to sign the petition, having his political preference clearly and unmistakably disclosed, or to refrain from signing. A potential subscriber, who is uncertain about whom he will support in the general election, but with an interest in the candidate will be unable to sign a petition because of the requisite declaration. The impact to the candidate is equally drastic. He is unable to espouse his views because the declaration greatly curtails his ability to appear on the ballot and become widely known. The possibili-

ty of having new candidates with unusual and creative political philosophies is greatly reduced. As a result, this requirement fosters a system which favors the status quo, while discouraging independent candidates and new political parties.

664 F.2d at 609.

Against these injuries, the appellees assert only that the provision "is there to protect the voter ... from inadvertently signing his primary nomination vote away." As stated earlier, we find this justification wholly unpersuasive. The state has already fully accomplished this goal by the requirement that each subscriber be given written and oral notice that he is forfeiting his right to vote in the primary by signing. Even if we assume that the appellees and the district court are correct and the declaration does not mean what it clearly says, the important thing is what the *voter* thinks. It is not enough to say what some court might interpret the provision to mean; it is the voter's rights which are being affected, not someone from the judiciary. Just as provisions that subscribers must take loyalty oaths to a party before putting their names on the party's nominating petitions have been struck down as violations of Equal Protection, *Libertarian Party of Nebraska v. Beermann,* 598 F.Supp. 57, 64 (D.Neb.1984); *Libertarian Party of South Dakota v. Kundert,* 579 F.Supp. 735, 739 (D.S.Dak. 1984), we conclude that the appellees' interest in making voters disclose their voting preferences is neither legitimate nor strong, and in fact serves no purpose whatever, except to have a chilling effect on the voter. Therefore, it is a violation of the potential subscribers' First and Fourteenth Amendment rights.

For all of the above reasons, the judgment of the district court will be affirmed, except insofar as it held to be constitutional that portion of W.Va.Code § 3–5–23(d), which requires persons wishing to sign nominating certificates to state that they "desire to vote" for the candidate therein

named.[5]

## AFFIRMED IN PART AND REVERSED IN PART.

K.K. HALL, Circuit Judge, concurring in part and dissenting in part:

I concur in Sections I and II of the majority opinion which uphold the constitutionality of the basic framework of West Virginia's nomination petition process. I must dissent, however, from the majority's conclusion that the "desire to vote" language of W.Va.Code § 3–5–23(d) violates the First and Fourteenth Amendments as well as a voter's statutory right to cast a secret ballot.

At the outset, I note my general agreement with the majority that if the "desire to vote" language actually forced a voter to reveal his voting preference in the general election, it would be constitutionally suspect. However, I do not join in the conclusion that the statute is unconstitutional because I do not read the statute to require such a revelation. Rather, I believe that a fair reading of this language in context with the balance of § 3–5–23 leads to the contrary conclusion that this language is nothing more than a declaration that voters who sign a nominating petition "desire to vote" for the candidate or candidates on that petition in the *primary* election. For support, I rely on the statute itself.

In regard to the content and form of a nominating certificate, § 3–5–23(c), (d) provide in part:

No signature on such certificate shall be counted unless it be that of a duly registered voter of the county, district or other political division represented by the office sought wherein such certificate was presented. It shall be the duty of those soliciting signatures to read to each *voter* whose signature is solicited the statement written on the certificate which gives notice that no person signing such certificate shall vote at any *primary* election to be held to nominate candidates for office to be voted for at the election to be held next after the date of signing such certificate.

(d) Such certificates shall state the name and residence of each of such candidates; that he is legally qualified to hold such office; that the subscribers are legally qualified and duly registered as voters and *desire to vote* for such candidates; and may designate, by not more than five words, a brief name of the party which such candidates represent and may adopt a device or emblem to be printed on the official ballot. All candidates nominated by the signing of such certificates shall have their names placed on the official ballot as candidates, as if otherwise nominated under the provisions of this chapter.

The secretary of state shall prescribe the form and content of the nomination certificates to be used for soliciting signatures. The content shall include the language to be used in giving written and oral notice to each voter that signing of the nominating certificate forfeits that voter's right to vote in the corresponding *primary* election.

(Emphasis added.) It seems clear to me that the "desire to vote" language refers to a voter's act of signing the petition and its legal effect on the voter's eligibility to vote in the primary election. Contrary to the majority's assertion, the desire to vote language is not "entirely separate and apart" from the statute's requirement that voters be warned that joining the petition will forfeit their right to vote in the primary. Rather, this language is more reasonably interpreted as part of the West Virginia legislature's warning to voters about the consequences of signing the petition. Under this interpretation, the provision cannot run afoul of the right to cast a secret ballot because it forces the voter to state publicly nothing more than he has already stated publicly by signing the petition, that he desire to vote for the candidate or candidates on the petition in the primary election. Likewise, the provision does not vio-

---

5. This ruling should not inconvenience election officials in West Virginia in 1990 since the only deletion from the petition is the "desire to vote" clause.

late the right of equal protection of law because the provision does not disadvantage signatories of the petition relative to any other voters.[1]

Further, the majority's reliance on *Anderson v. Mills,* 664 F.2d 600 (6th Cir. 1987), is misplaced. While *Mills* appears to be on all fours with this case, it is not. The "desire to vote" clause in *Mills,* KRS § 118.315 (repealed 1988 Ky. Acts Ch. 17 § 11), could not have possibly served the same cautionary function as it serves in § 3–5–23(d) because the signatory of a Kentucky petition does not forfeit his primary vote.[2] Consequently, the only election the Kentucky statute could have been referring to was the general election.

In sum, I find the majority's interpretation of § 3–5–23(d) strained and unsupported. I also find it disappointing in view of the Supreme Court's repeated admonitions that courts should strive to interpret statutes as a whole, rather than focusing on a particular phrase or sentence, and that statutes should be interpreted to avoid constitutional difficulties. *E.g., Webster v. Reproductive Health Services,* — U.S. —, 109 S.Ct. 3040, 3054, 106 L.Ed.2d 410 (1989). The majority's myopic focus on the "desire to vote" language, in disregard of these axioms of statutory construction, has led it to an erroneous result. Accordingly, I must dissent from Sections III and IV of the majority opinion and would affirm the district court in all respects.

---

1. In fact, the "desire to vote" declaration of minor party petition signatories is analogous to West Virginia's requirement that major party members must publicly declare their party affiliation and vote in the primary only for candidates of their party. W.Va.Code § 3–2–18. This analogy is even closer than one might think because in West Virginia, primary elections are often uncontested. Consequently, a declaration of affiliation with a major party is, for all intents and purposes, a declaration of for whom the voter desires to vote.

2. However, a voter can sign only one petition per office (except for the office of soil and water conservation district supervisors). KRS § 118.315(2).