**Simon MCCLURE and the West Virginia Libertarian Party, Plaintiffs,**

v.

**Joe MANCHIN, III, Secretary of State, Defendant.**

**No. CIV.A.1:03 CV 205.**

United States District Court, N.D. West Virginia.

Dec. 22, 2003.

Robert M. Bastress, Esquire, West Virginia University College of Law, Morgantown, WV, Counsel for Plaintiffs.

Christie S. Utt, Attorney General Office, State Capitol Complex, Charleston, WV, Counsel for defendant.

## MEMORANDUM OPINION
## AND ORDER

KEELEY, District Judge.

Before the Court are the plaintiffs' motion for preliminary injunction and defendant's motions to dismiss for improper venue and failure to state a claim. After the parties submitted briefs on these issues, the Court heard oral arguments on December 5, 2003. The matter is now ripe for review, and for the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** plaintiffs' motion and **DENIES** defendant's motions.

## I. BACKGROUND

The plaintiffs in this action are the West Virginia Libertarian Party ("WVLP") and Simon McClure ("McClure"), a WVLP candidate for governor of West Virginia. McClure filed his pre-candidacy papers with the defendant, Secretary of State Joe Manchin, III, who is responsible for administering state election laws. Because the WVLP's candidate for governor did not poll at least one percent of the total number of votes cast for all candidates for governor in the 2000 election, the party and its candidates must follow the procedures enumerated by West Virginia Code sections 3–5–23 and 3–5–24 in order to appear on the general election ballot in 2004.

To gain access to the 2004 general election ballot under sections 3–5–23 and 3–5–24, plaintiffs must submit nominating certificates signed by enough registered voters to equal at least two percent of the votes cast for governor in the 2000 general election. Under section 3–5–23(b), any person who solicits signatures for nominating certificates must first obtain credentials from the clerk of the county commission. This document states the name and address of the solicitor as well as the candidates' names and the offices that they are seeking. Plaintiffs plan to use volunteer or paid canvassers to solicit nominating signatures, but they claim that the credentials requirement in section 3–5–23(b) compromises the canvassers' anonymity. Moreover, the plaintiffs argue that this statutory provision substantially burdens the opportunity for the plaintiffs and other minor party and independent candidates to secure access to the general election ballot.

According to section 3–5–23(c), persons who solicit signatures must "read to each voter whose signature is solicited the statement written on the certificate which gives notice that no person signing the certificate shall vote at any primary election to be held to nominate candidates for office to be voted for at the election to be held next after the date of signing such certificate." Under section 3–5–23(f), a canvasser's failure to convey that message to any solicited voter constitutes a misdemeanor, exposing the canvasser to criminal penalties of up to one year in jail and one thousand dollars in fines.

McClure and the WVLP have begun to circulate nominating certificates to obtain a sufficient number of voter signatures to qualify for the 2004 general election ballot. They assert, however, that many voters who would otherwise endorse their nominating certificate decline to do so when told that they may not vote in the 2004 primary election if they sign the certificate. Thus, plaintiffs argue that section 3–5–23(c) substantially burdens their opportunity to secure access to the general election ballot.

## I. ANALYSIS

### A. Venue

Manchin argues that venue is improper in this Court. According to 28 U.S.C. § 1391(b), venue is appropriate in "a judicial district where any defendant resides, if all defendants reside in the

same State," or in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Manchin argues that venue is only proper in the Southern District because he resides there and a substantial part of the events giving rise to the claim will occur there.

■■■ Manchin's argument is baseless. *All* of the events allegedly causing harm to the plaintiffs have occurred in the Northern District, "where operation of [West Virginia Code section] 3–5–23 has required [McClure] to inform voters of the purported primary vote forfeiture and required his canvassers to obtain credentials." (Pl. Memo. Supp. Prelim. Inj. at 17). Although a civil action could be brought in the Southern District under § 1391(b)(1)— and perhaps § 1391(b)(2) also—proper venues are not mutually exclusive. Indeed, venue is subject to the choice of the plaintiffs, not the defendant. Thus, under § 1391(b)(2), venue is appropriate in the Northern District because a substantial part of the events giving rise to the claim occurred here.

### B. Preliminary Injunction Standard

■■■ "The grant of interim relief [is] an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it." *Steakhouse, Inc. v. City of Raleigh,* 166 F.3d 634, 637 (4th Cir.1999) (quotation omitted). Three factors, introduced in the seminal case of *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir.1977), guide district courts in determining whether injunctive relief is appropriate:

First, [the court] must balance the likelihood of irreparable harm to the plaintiff if the injunction is refused against the likelihood of irreparable harm to the defendant if it is granted. Second, the court should consider the likelihood that the plaintiff will succeed on the merits. The more the balance of harms leans away from the plaintiff, the stronger his showing on the merits must be. Finally, the court must consider the public interest.

*Steakhouse,* 166 F.3d at 637 (citing *Blackwelder* ). The plaintiffs bear the burden of proving that the factors favor granting the injunction. *Manning v. Hunt,* 119 F.3d 254, 263 (4th Cir.1997).

Under this hardship balancing test, the first two factors regarding the likelihood of irreparable harm to the plaintiff if denied and of harm to the defendant if granted are the most important. Thus, the first task of the district court is to determine the harm that will be suffered by the plaintiff if no preliminary injunction is entered. The harm demonstrated by the plaintiff must be neither remote nor speculative, but actual and imminent. The district court must then balance this harm against the harm which would be suffered by the defendant if the preliminary injunction is granted.

*Id.* (citations and quotations omitted). If, after weighing the relative harms faced by the parties,

the balance tips decidedly in favor of the plaintiff, a preliminary injunction will be granted if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation. As the balance tips away from the plaintiff, a stronger showing on the merits is required.

*Id.* (quotation omitted).

### C. West Virginia Code section 3–5–23

Plaintiffs challenge the facial validity of sections 3–5–23(b) and 3–5–23(c) of the

West Virginia Code. Under section 3–5–23(b), persons soliciting signatures for nominating certificates must first obtain credentials from the clerk of the county commission. These credentials include the name and address of the canvasser, a statement of authorization to solicit signatures, and the seal of the clerk of the county commission. *Id.*

Pursuant to section 3–5–23(c), canvassers must read to each solicited voter a "statement written on the [nominating] certificate which gives notice that no person signing such certificate shall vote at any primary election to be held to nominate candidates for office" in the next election. Failure to read this statement constitutes a misdemeanor crime. *Id.* § 3–5–23(f). However, "no criminal penalty may be imposed upon anyone who signs a nomination certificate and votes in the primary election held after the date the certificate was signed." *Id.*

### 1. Likelihood of Irreparable Harm

#### a. Harm to McClure and the WVLP

The Court must first "determine the harm that will be suffered by the plaintiff[s] if no preliminary injunction is entered." *Manning*, 119 F.3d at 263. To that end, McClure and the WVLP assert that the credentials provision of section 3–5–23(b) is unduly burdensome in two respects.

First, the plaintiffs contend that the credentials requirement precludes many volunteers from becoming canvassers. The secretary of state's "Guidelines for Independent and Minor Party Petitioners" indicate that, to obtain credentials, one must appear in person at the office of the clerk of the county commission during regular work hours. (Def.Ex. A) ("Go to the county clerk's office in the county where you plan to solicit signatures and request credentials. The secretary of state has provided clerks with Form P–1 for those soliciting for independent and minor party candidates."). WVLP state chairman Richard Kerr testified at the hearing that he was required to obtain credentials in person. Thus, McClure and the WVLP argue that volunteers who work full time or live relatively far from the clerk's office are often incapable of acquiring credentials. As a second basis for attacking section 3–5–23(b), the plaintiffs assert that the credentials compromise canvassers' anonymity by requiring the name and address of the canvasser to be displayed to every solicited voter. *See id.*

In challenging the facial validity of section 3–5–23(b), McClure and the WVLP also contend that the mere requirement of credentials is unconstitutionally oppressive. They only allege, however, that the credentials requirement is harmful to the extent that it compromises canvasser anonymity and dissuades volunteers from obtaining credentials. (Pl. Mem. Supp. Prelim. Inj. at 5). Such harm is distinguishable from harm resulting from the bare requirement that canvassers obtain and carry credentials before soliciting signatures on nomination certificates. Therefore, the plaintiffs fail to demonstrate how the credentials requirement is intrinsically harmful apart from the explicitly identified burdens of section 3–5–23(b).

With respect to section 3–5–23(c), McClure and the WVLP argue that the mandatory notice of vote forfeiture impairs their prospects of gaining access to the ballot. In their supporting memorandum, they aver that "[t]he notice confuses voters, requires considerable [sic] more persuasion from canvassers to get a signature, and thus requires significantly more canvasser time per signature obtained." (Pl.'s Mem. Supp. Prelim. Inj. at 4). Deposition testimony of Ron Crickenberger indicates that collecting nomination signatures

in West Virginia is "much, much more difficult" than in other states because of the primary vote forfeiture notice. (Crickenberger Dep. at 9). Crickenberger, a former Political Director for the Libertarian National Committee, has significant experience assisting ballot access and petition drives for different state Libertarian parties, including the WVLP.

The Court finds that the challenged provisions threaten irreparable harm to the plaintiffs by suppressing their First Amendment rights. *See Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citing *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)). Both sections place substantial obstacles in the paths of volunteer canvassers, who are the lifeblood of minor party campaigns. Similarly, the statutory provisions encumber efforts to gain a sufficient number of signatures to place WVLP candidates on the primary ballot, which is already a daunting task. The magnitude of likely irreparable harm is particularly acute in light of the crucial role of the 2004 election in determining the WVLP's ballot status in 2006 and 2008. Furthermore, the identification of a canvasser's name and address on credentials constitutes an irreparable sacrifice of anonymity.

### b. Harm to the State

■ Next, the Court must balance the harm suffered by the plaintiffs "against the harm which would be suffered by the defendant if the preliminary injunction is granted." *Manning,* 119 F.3d at 263. Enjoining section 3–5–23(b) entirely is likely to irreparably harm the State, which would have no other adequate means of holding canvassers accountable for voter harassment or deceitful practices short of fraud. In *West Virginia Libertarian Party v. Manchin,* 165 W.Va. 206, 270 S.E.2d 634 (1980), the Supreme Court of Appeals of West Virginia held that the credentials requirement "serves a substantial State interest in assuring the integrity of the signature solicitation process." *Id.* at 643. Therefore, notwithstanding the plaintiffs' criticisms of its effectiveness, the credentials requirement appears to be the best mechanism available to the State to monitor the propriety of signature solicitation.

Irreparable harm to the State does not arise, however, if the Court enjoins those provisions of section 3–5–23(b) that require 1) credentials to include a canvasser's name and address and 2) acquisition of credentials in person. If the credentials requirement otherwise remains in force, the State can devise alternative means to track canvassers about whom voters may complain. Moreover, as the State itself intimated at the December 5, 2003 hearing, obtaining credentials by fax, email, or internet is a practically viable option that section 3–5–23(b) does not expressly prohibit.

A preliminary injunction of the notice provision in section 3–5–23(c) also threatens minimal irreparable harm to the State. This command is virtually unenforceable, which the West Virginia Code and the hearing testimony of Deputy Secretary of State Jan Casto confirm. The statute requires canvassers, under penalty of law, to tell voters that signing a nominating certificate precludes them from voting in the ensuing primary election. Voters face no tangible penalty, however, for refusing to abide by this directive. Indeed, as McClure and the WVLP correctly observe, nothing in the law prevents canvassers from telling voters—truthfully—that they will suffer no consequences if they vote in the primary despite the notice to the contrary. Moreover, as Deputy Secretary of State Casto indicated, West Virginia cur-

rently has no mechanism apart from *ad hoc* judicial relief to verify whether· primary voters have also signed a nominating certificate. *Cf. id.* § 3–5–23(d) (authorizing the secretary of state and the clerk of the circuit court to request that the attorney general or prosecuting attorney initiate *quo warranto* proceeding against a *nominee* to determine the validity of his or her nomination). Thus, preliminarily enjoining a statutory duty to read voters a statement that is arguably a legal fiction can only marginally harm the State.

On balance, the irreparable harm faced by the plaintiffs in the absence of injunctive relief heavily outweighs that faced by the State if the Court enjoins section 3–5–23. If the Court enjoins the credentials requirement in its entirety, however, the irreparable harm faced by the State outweighs any harm that the plaintiffs may experience.

### 2. Likelihood of Success on the Merits

This case involves a constitutional challenge to primary election nominating procedures. Since state election laws are at issue, the Court evaluates the merits of plaintiffs' contentions in view of the test articulated by the United States Supreme Court in *Anderson v. Celebrezze,* 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983):

> [A court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the

plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

(citations omitted).

▮▮▮ The application of section 3–5–23 clearly burdens core political speech. The statute hinders plaintiffs' advocacy of candidates, restricts their opportunity to secure access to the general election ballot, and prohibits anonymous canvassing.

On the other hand, the State asserts important interests to justify the mandates of section 3–5–23. It emphasizes that the credentialing requirement is necessary to hold accountable canvassers who mislead or harass solicited voters. *See Manchin,* 270 S.E.2d at 643. With respect to section 3–5–23(c), the State contends that despite the lack of an enforcement apparatus, the state code still prohibits voting in the primary after signing a nominating certificate. According to the State, this requirement is necessary to ensure that voters have only one vote in the primary election.[1]

---

1. The Court was not presented—nor has it found—a provision in the West Virginia Code that expressly equates one's signature on a nominating certificate with a vote cast in a primary election. According to the West Virginia Supreme Court of Appeals, "[w]hile the act of signing the subject certificate does not constitute a vote in the usual sense, nor is the certificate a ballot as provided in Code, 1931, 3–1–4, as amended, such act is so analogous

[sic] to the voting process that it is entitled to the same consideration as a vote by ballot." *State ex rel. Daily Gazette Co. v. Bailey,* 152 W.Va. 521, 164 S.E.2d 414, 418 (1968). Nonetheless, the Court observes there are significant differences in primary voting and nomination certificates, including secrecy, security of collection, and time allotted for collection.

## a. Section 3–5–23(b) Credentials Requirement

■ As already discussed, credentials serve the State's interest in preserving the integrity of signature solicitation. The strength of this interest, however, does not appear to justify the identification of the canvasser's name and address on the credentials. *See Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 199, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). In *Buckley*, the Supreme Court struck down a state law requiring ballot initiative petition circulators to wear name badges, declaring,

> [t]he injury to speech is heightened for the petition circulator because the badge requirement compels personal name identification at the precise moment when the circulator's interest in anonymity is greatest. For this very reason, the name badge requirement does not qualify for inclusion among the "more limited [election process] identification requirements" to which we alluded in *McIntyre [v. Ohio Elections Commission*, 514 U.S. 334, 353, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ].

*Id.* (citation omitted). Thus, *Buckley* strongly suggests that the mandatory identification of a canvasser's name and address on credentials is unconstitutional.

■ The limited means by which volunteers may obtain credentials also does not advance the State's interest in holding canvassers accountable. As an initial matter, section 3–5–23(b) does not explicitly require volunteers to apply for credentials in person. Moreover, the statute suggests that the clerk of the county commission must issue credentials as a matter of course; no evidence indicates otherwise. The State presented no evidence implying that the application was complex[2] or re-

quired personal contact or identification. Likewise, the State failed to show an inability to distribute the application through other mediums. Therefore, the Court finds that the burden imposed on volunteers to obtain credentials in person is unnecessary to promote the State's interests. Accordingly, the purported requirement of in-person application for credentials is unlikely to withstand constitutional scrutiny.

■ Notwithstanding the Court's evaluation of these aspects of section 3–5–23(b), the plaintiffs claim that the mere requirement of credentials violates their First and Fourteenth Amendment rights. The Court, however, is reluctant to reach such a conclusion at this juncture. As discussed above, McClure and the WVLP have produced no persuasive evidence suggesting that credentials are intrinsically burdensome. Likewise, they have not sufficiently demonstrated that credentials are unnecessary to further the State's interest in holding canvassers accountable.

In asserting the facial invalidity of the credentials requirement, the plaintiffs rely on *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002). In that case, the Supreme Court struck down a municipal ordinance that "prohibits 'canvassers' and others from 'going in and upon' private residential property for the purpose of promoting any 'cause' without first having obtained a permit" from the mayor's office. *Id.* at 154, 122 S.Ct. 2080. The ordinance required completion of a fairly lengthy and detailed application to obtain a permit. *See id.* at 155 n. 2, 122 S.Ct. 2080. It also required a canvasser to "carry the permit upon his person and exhibit it whenever requested

2. To the contrary, McClure testified that it only took him about 30–40 minutes to apply for and receive credentials at the clerk's office.

to do so by a police officer or by a resident." *Id.* at 155, 122 S.Ct. 2080.

The ordinance in *Watchtower* is readily distinguishable from the state law at issue here. Of first importance, the ordinance regulated an enormous range of speech, a consideration that weighed heavily in the Supreme Court's analysis in *Watchtower*. *See id.* at 164, 165, 122 S.Ct. 2080. Section 3–5–23(b), by contrast, applies to a very limited group of individuals for a very specific purpose, i.e., canvassers seeking signatures for a primary nominating certificate. Similarly, the ordinance in *Watchtower* was poorly tailored to serve the village's interests. *See id.* at 168, 122 S.Ct. 2080 ("Also central to our conclusion that the ordinance does not pass First Amendment scrutiny is that it is not tailored to the Village's stated interests."). Here, however, the credentials (particularly without name and address identification) are a reasonably narrow means to address a legitimate State concern about the integrity of the signature solicitation process. *See Buckley*, 525 U.S. at 191, 119 S.Ct. 636 ("States ... have considerable leeway to protect the integrity and reliability of ... election *process* ....")

In further support of their constitutional attack on the credentials requirement, McClure and the WVLP cite cases that involve much more direct and blatant regulation of speech than is present in the case at bar. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (striking down an Ohio law that prohibited the distribution of anonymous campaign literature). With the exception of *Buckley*, these cases also do not address election laws, which present a unique context implicating more significant state interests. Therefore, the Court concludes that the credentials requirement of section 3–5–23(b), without personal identification and

mandatory in-person acquisition, will likely pass constitutional muster.

**b. Section 3–5–23(c) Notice Provision**

██ The notice provision of section 3–5–23(c) also lacks sufficient justification to withstand constitutional scrutiny. As the Court has already alluded, a weighing of the relative harms caused by enjoining the mandatory disclosure of vote forfeiture "tips decidedly in favor" of the plaintiffs. *Manning*, 119 F.3d at 263. Therefore, the Court must only determine whether "plaintiff[s] [have] raised questions going to the merits so serious, substantial, difficult, and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation." *Id.*

The State contends that the decision in *Socialist Workers Party v. Hechler*, 890 F.2d 1303 (4th Cir.1989), settles the question of the constitutionality of section 3–5–23(c). In *Socialist Workers Party*, the Fourth Circuit upheld the statutorily mandated forfeiture of the right to vote in the primary election after signing a nominating petition. 890 F.2d at 1307. That opinion, however, pre-dates a significant amendment to section 3–5–23 in 1999, which added a proviso to section 3–5–23(f) "[t]hat no criminal penalty may be imposed upon anyone who signs a nomination certificate and votes in the primary election held after the date the certificate was signed." Before 1999, voters who signed a nomination certificate and voted in the ensuing primary could be charged with a misdemeanor. Since the 1999 amendment, however, they can sign innumerable petitions and are free to vote with impunity.

The Court agrees with the State that section 3–5–23, reasonably interpreted, still technically prohibits voting in the primary after signing a nomination certificate. Moreover, in *Socialist Workers Party*, the Fourth Circuit validated the State's

interest in preventing multiple nominating votes in the primary election. 890 F.2d at 1308.

But the State's interest in proscribing this practice is undermined by the very statute that proscribes it. As plaintiffs note, any voter informed of the law is more likely to sign a nominating certificate and vote because he knows he cannot be punished for it. The irrationality of this law is patent and militates against its necessity. *See Anderson,* 460 U.S. at 789, 103 S.Ct. 1564. That voters can vote in the primary and permissibly sign nominating petitions for president and vice-president afterwards also belies the notice provision's legitimacy. *See* W. Va.Code § 3–5–23(a). Therefore, questions raised as to the constitutionality of section 3–5–23(c) are quite "serious, substantial, difficult, and doubtful," meriting a "more deliberate investigation." *Manning,* 119 F.3d at 263.[3]

### 3. Public Interest

 Ballot accessibility and fair election procedures are paramount to the public interest. Maintaining some method of accountability for nominating certificate canvassers is also important to the public. These interests need not exist in tension with each other, and the Court refuses to weigh them as such. Each interest has independent significance, which guides the Court in appropriately tailoring the requested injunctive relief.

Moreover, since the state government is a servant of the public, the State's interest is inextricably related to the public interest (and vice versa). Indeed, to the extent

that the State does not establish a strong interest in upholding a statutory provision, it also fails to establish a strong public interest in doing so. Therefore, with the exception of the modified credentials requirement, the Court finds that preliminarily enjoining the challenged provisions of sections 3–5–23(b) and 3–5–23(c) serves the public interest.

### D. Motion to Dismiss

 In its opposition to plaintiffs' motion for injunctive relief, the State also moved to dismiss plaintiffs' claim pursuant to Federal Rule of Procedure 12(b)(6). In support of this motion, the State claims that, as a matter of *stare decisis,* previous decisions upholding the constitutionality of section 3–5–23 preclude a challenge to the statute's constitutionality now.

 When civil rights are at issue, as here, the Fourth Circuit provides unique guidance in reviewing a Rule 12(b)(6) motion. In such instances, a court "must be especially solicitous of the wrongs alleged and must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir.1999) (quotation omitted). Recent United States Supreme Court precedent and the legislature's subsequent amendment of section 3–5–23 cast serious doubt on the validity of certain provisions of the statute. Therefore, the plaintiffs' constitu-

---

**3.** The Court does not address plaintiffs' claim that the notice provision of section 3–5–23(c) mandates speech from canvassers in violation of their First Amendment rights. The other legal arguments presented by the plaintiffs provide ample basis for the Court to rule on the preliminary injunction. Moreover, the Court is skeptical of the applicability of the "forced speech" cases cited by the plaintiffs, which involve either the divulgence of private information, *e.g., McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995), or the expression of a particular opinion or ideology, *e.g., W. Va. State Bd. of Edu. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). The statement mandated by section 3–5–23(c) does not appear to fall under either category.

tional challenges must necessarily survive a motion to dismiss.

## III. CONCLUSION

██ Since the claim of McClure and the WVLP arose in the Northern District and presents a colorable legal challenge to the constitutionality of section 3–5–23, the Court **DENIES** defendant Manchin's motions to dismiss. Furthermore, after considering each factor of the *Blackwelder* analysis and weighing them accordingly, the Court concludes that a preliminary injunction tailored to the facts of this case is necessary.

Accordingly, the Court **GRANTS IN PART** and **DENIES IN PART** the preliminary injunction requested by the plaintiffs, and **ORDERS AS FOLLOWS:**

1) The defendant, Joe Manchin, III, Secretary of State, and his officers, agents, servants, and employees are **ENJOINED** from enforcing:

 a) The requirement of personal identification on credentials, W. Va. Code § 3–5–23(b);

 b) Any construed requirement under that statute of obtaining credentials in person at the clerk's office; and

 c) The notice provision of section 3–5–23(c).

2) The credentials requirement of section 3–5–23(b) will otherwise remain in force.

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record by facsimile transmission and first class mail.