**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHRISTINE FISHBECK; BRIAN HORTON;
THE LIBERTARIAN NATIONAL
COMMITTEE; THE WEST VIRGINIA
LIBERTARIAN PARTY,
Plaintiffs-Appellants,

and

KARL HESS,
Plaintiff,

No. 95-1951

v.

KEN HECHLER, Secretary of State,
Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(CA-92-807-2)

Argued: May 6, 1996

Decided: June 3, 1996

Before RUSSELL and MICHAEL, Circuit Judges, and PAYNE,
United States District Judge for the Eastern District of Virginia,
sitting by designation.

_____

Affirmed by published opinion. Judge Russell wrote the majority
opinion, in which Judge Michael joined. Judge Payne wrote a dissent-
ing opinion.

_____

**COUNSEL**

**ARGUED:** Robert Milton Bastress, Jr., WEST VIRGINIA UNIVER-
SITY COLLEGE OF LAW, Morgantown, West Virginia, for Appel-
lants. Daynus Jividen, OFFICE OF THE ATTORNEY GENERAL
OF WEST VIRGINIA, Charleston, West Virginia, for Appellee.

_____

**OPINION**

RUSSELL, Circuit Judge:

The state and national Libertarian Party and two of its members[1]
challenge West Virginia's primary-election-eve deadline for filing
nominating petitions as an unconstitutional restriction on access to the
ballot.

In 1992, the Libertarian Party (the "Party") sought to place Karl
Hess on the general election ballot in West Virginia as the Party's
candidate for governor. Because the Party had not accumulated one
percent of the vote in the preceding gubernatorial election, West Vir-
ginia election law required the party to submit a nominating petition
endorsed by a number of registered voters equal to one percent of the
total voter turnout in the preceding gubernatorial election. W. Va.
Code §§ 3-1-8 and 3-5-23. West Virginia law requires candidates for
offices other than president or vice-president to submit such nominat-
ing petitions no later than the day preceding the primary,[2] which is
held on the second Tuesday in May. W. Va. Code §§ 3-5-1 and 3-5-
24. West Virginia law also prohibits a registered voter who signs a

_____

[1] The plaintiffs are the Libertarian Party National Committee; the West
Virginia Libertarian Party; Brian Horton, the West Virginia Libertarian
Party Chairman, the coordinator of the West Virginia Libertarian Party's
petition drive in 1992, and the Libertarian Party's candidate for West
Virginia State Auditor in 1992; and Christine Fishbeck, a member of the
Libertarian Party. Karl Hess, the Libertarian Party's candidate for West
Virginia governor in 1992 was originally a plaintiff; he died in 1994.
[2] Nominating petitions for candidates for president or vice-president
must be submitted by August 1 in the year of the election. W. Va. Code
§ 3-5-23(a).

nominating petition from voting in the next primary election. W. Va. Code § 3-5-23(c).

On or around March 1, 1992, the Party began its petition drive to collect the 6,533 signatures required to place Hess on the ballot. On May 11, 1992, the day before the 1992 primary election, the Party filed its petition with 11,159 signatures supporting Hess' candidacy. The Secretary of State, Ken Hechler, subsequently declared 6,704 of the submitted signatures to be invalid. Of these, 2,574 signators were rejected because they had voted in the primary. **3** The Secretary of State accepted only 4,455 signatures supporting Hess' candidacy and thus disqualified the Libertarian Party from access to the 1992 gubernatorial ballot.

Upon learning in late July that it did not have enough signatures to place Hess on the ballot, the Party immediately restarted its ballot drive. Brian Horton, who had coordinated the failed petition drive, was replaced by two of the Party's national directors. On August 3, 1992, the Party filed 4,821 additional signatures. The Secretary of State found only 2,202 of these additional signatures to be valid, but these signatures, in addition to 4,455 valid signatures submitted on May 11, were sufficient to meet the one-percent requirement. The Secretary of State, however, did not place Hess on the 1992 gubernatorial ballot because the Libertarian Party had not filed the requisite number of signatures by the day before the primary election.

On August 8, 1992, the plaintiffs filed this action in the United States District Court for the Southern District of West Virginia. The plaintiffs challenge West Virginia's primary-eve deadline for filing nominating petitions as an unconstitutional restriction on access to the ballot. The plaintiffs do not challenge West Virginia's requirement

_____

**3** Under West Virginia law, persons soliciting signatures for a nominating petition must inform each potential signator that signing the petition disqualifies him or her from participating in the primary election. W. Va. Code § 3-5-23(c). After the Secretary of State received complaints that the Party's solicitors were not always informing prospective signators of their disqualification from voting in the primary, Hess agreed to allow the Secretary of State to void all signators who subsequently voted in the 1992 primary.

that registered voters choose between signing a nominating petition and voting in the primary election. Instead, they argue that the primary-eve filing deadline, in light of the forced-choice provision, is unconstitutional.

When considering a challenge to a state election law, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiffs seek to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule . . . ." Anderson v. Celebrezze, 460 U.S. 780, 789 (1983). In doing so, the court must consider "the extent to which those interests make it necessary to burden the plaintiff's rights." Id . The Court has stated:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized, when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." [Norman v. Reed, 112 S. Ct. 698, 705 (1992).] But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. [Anderson, 460 U.S. at 788.]

Burdick v. Takushi, 112 S. Ct. 2059, 2063-64 (1992).

In a previous case, the district court considered and upheld the constitutionality of West Virginia's primary-eve filing deadline. The district court held that "the burdens placed upon the challengers under West Virginia election laws are not great" and that "West Virginia has an important interest in requiring third party and independent candidates to demonstrate a modicum of community support before placing their names on its general election ballot." Socialist Workers Party v. Hechler, 696 F. Supp. 190, 201-02 (S.D. W. Va. 1988). On appeal, we affirmed the portion of the district court's decision upholding the constitutionality of the primary-eve filing deadline. Socialist Workers

4

Party v. Hechler, 890 F.2d 1303, 1305-07 (4th Cir. 1989), cert. denied, 495 U.S. 932 (1990).

In the instant case, the Libertarian Party provided the district court with historical data of minor party access to the ballot in West Virginia throughout this century. To summarize, their evidence demonstrated that minor parties placed numerous candidates on the ballot for congressional and state offices in the election years before 1937. Between 1937 and 1980, no minor party candidate for Congressional or state office gained access to the ballot, and since 1980, only a handful of minor party candidates have been placed on the ballot. The plaintiffs correlated this historical data with the various changes in West Virginia's election laws over the same period of time in an attempt to demonstrate that the primary-eve filing deadline is a severe burden on minor parties' ability to gain access to the ballot.

In reviewing this historical evidence, we found that several facts undermined the conclusion that the Libertarian Party wanted us to draw. In 1932 and 1936, West Virginia election law included the same restrictions as the current code. In those years, West Virginia held its primary on the second Tuesday in May, and it imposed the primary-eve filing deadline and the forced-choice provision. Despite these restrictions, several dozen minor party candidates gained access to the ballot for congressional and statewide offices in 1932 and 1936. In 1984, furthermore, West Virginia suspended its primary-eve filing deadline, and minor party candidates could file nominating petitions as late as August. Despite the suspension of the deadline, only one minor party candidate gained access to the ballot for congressional and statewide offices, a decrease from the four minor candidates who gained access to the ballot for congressional and statewide offices in 1982, when West Virginia enforced the primary-eve filing deadline. If the primary-eve filing deadline was a severe burden on ballot access, as the plaintiffs claim, we would have expected to see far fewer minor party candidates on the ballot in the 1932 and 1936 elections and an explosion of minor party candidates in 1984. The plaintiffs' historical evidence appears to demonstrate just the opposite.

The district court carefully analyzed the record submitted by the plaintiffs and held that West Virginia's primary-eve filing deadline is not a severe restriction on minor parties' access to the ballot, and it

5

again upheld the constitutionality of the primary-eve filing deadline. After examining the record, considering the parties' briefs, and hearing oral argument, we affirm on the thorough reasoning of the district court. See Hess v. Hechler, ___ F. Supp. ___ (S.D. W. Va. 1995).

AFFIRMED

PAYNE, District Judge, dissenting:

In Anderson v. Celebrezze, 460 U.S. 780 (1983), the Supreme Court held that in evaluating restrictions imposed by the states on access to election ballots, the principal concern of the courts "is with the tendency of [those] ballot access restrictions `to limit the field of candidates from which voters might choose.'" Id. at 786 (quoting Bullock v. Carter, 405 U.S. 134, 143 (1972)). Anderson underscored the acknowledgement made in Storer v. Brown, 415 U.S. 724 (1974) that "`as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" Id. at 788 (quoting Storer v. Brown, 415 U.S. at 730).

The Court, in Anderson, also emphasized that challenges to specific provisions of state election laws cannot be resolved by application of any "litmus-paper test" but that "[i]nstead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation." Id. at 789. To that end, the Court instructed that:

> It [the court] must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the state as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

Id. at 789. After conducting that tripartite inquiry, "[t]he constitutionality of the challenged restriction is then to be made on the basis of

6

a necessarily hard evaluative judgment of the relative weight of state interests and voters' rights." Cromer v. South Carolina, 917 F.2d 819, 823 (4th Cir. 1990).

As the Supreme Court explained in Storer, the inevitable question for judgment becomes:

> [I]n the context of [the state's] politics, could a reasonably diligent independent candidate be expected to satisfy the signature requirements, or will it be only rarely that the unaffiliated candidate will succeed in getting on the ballot? Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not.

Storer v. Brown, 415 U.S. at 742 (emphasis added); see also Mandel v. Bradley, 432 U.S. 173, 177 (1977) (emphasizing that this is the appropriate inquiry in the court's analysis of the burden faced by potential candidates).

More recently, in Burdick v. Takushi, 112 S. Ct. 2059 (1992), the Supreme Court prescribed a sliding scale analysis, pursuant to which:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions.

Burdick v. Takushi, 112 S. Ct. at 2063-64 (citations omitted) (emphasis added).

7

I respectfully submit that, when considered within the foregoing framework and in light of this Court's decision in Cromer v. South Carolina, 917 F.2d 819 (4th Cir. 1990), the ballot access restrictions at issue here are severe and the interests proffered by the state are either constitutionally insignificant, not narrowly tailored, or both. For those reasons, I respectfully dissent.

A. The Severity Of the Burden

The majority opinion accurately summarizes the essential history and present status of the lack of success that minority parties and independent candidates have encountered in attempting to achieve access to the West Virginia general ballot. The district court's opinion provides further details of that history consistent with that summary recitation. Nonetheless, to assess the severity of the burden imposed by the challenged West Virginia restrictions, it is helpful to augment the majority opinion's discussion somewhat by referring to the findings of the district court.[1]

It appears that the parties agree generally with the findings of the district court respecting the number of third party and independent candidates who actually appeared on the ballots of West Virginia over the years. Further, an examination of the record confirms that the findings made by the district court in that regard are fully supported by the record. Hence, it is appropriate briefly to summarize the findings of the district court.

_____

[1] Before undertaking that exposition, it is appropriate to note that, because many of the records respecting the filings made over time by third parties and independent candidates were destroyed accidentally by the state, the plaintiff was unable to compile an analysis which compared the data of the total number of those who have filed a notice that they intended to seek access to the ballot with those who have been placed on the ballot. Additionally, although it was possible theoretically for the plaintiffs to search the records of the various county courthouses in West Virginia for filing information, the burden of that undertaking was beyond the reach of the plaintiffs' resources. In any event, it is doubtful that a plaintiff is required to go to that extent.

8

1. From 1923 to 1932, the state conducted, alternatively, May and August primaries (held in May during presidential election years and on the first Tuesday in August of all other years). Independent and minor party candidates could gain access to the general election ballot through the petitioning process. The filing date for nominating positions was either 20 days after the primary or 30 days before the primary (depending upon an interpretation of conflicting code provisions) (J.A. 80-81).

2. In the four elections conducted between 1923 and 1931, there were 15 minor party candidates for state legislature, 17 for statewide offices and 7 for the United States Congress. Of these 39 candidates, 34 gained access to the ballot in presidential election years when the primary was held in May while only 5 were on the ballot in the off years when the primary was in August. (J.A. 81).

3. State law changed in 1932 respecting the process of obtaining nomination through the certification process. The primary date was moved to the second Tuesday in May for presidential election years and remained on the first Tuesday in August for non-presidential election years. The forced choice provision remained in effect as previously. (J.A. 81-82).

4. In the three elections held between 1932 and 1937, there were 35 candidates for the state legislature, 24 for statewide offices, 18 for United States Congress, and 5 for President. Seventy-seven candidates thus gained access to the ballot during that period. (J.A. 82).

5. From 1937 to 1963, 13 elections were held. No independent or minor party candidate appeared on the general election ballot for any statewide office in any of the 13 elections in this 26 year period. Only one presidential candidate was on the ballot during that period, Henry Wallace, in 1948. (J.A. 83-84).

9

6. From 1964 through the election of 1978, the non-presidential year primary was moved to May so that all primary elections occurred on the second Tuesday in May. Eight elections were held during that 14 year period, but no independent or minor party candidate appeared on the general election ballot for any state office and only one presidential candidate , George Wallace, in 1968, was on the ballot. (J.A. 84).

7. In 1978 the primary date was moved from the second Tuesday in May to the first Tuesday in June, effective 1980. (J.A. 84).

8. The certification process remained the same and there were no legislative changes until 1985. However, the West Virginia Supreme Court of Appeals decided West Virginia Libertarian Party v. Manchin, 270 S.E.2d 634 (W. Va. 1980) which invalidated a number of the West Virginia voting law restrictions. In the next election, that of 1982, the forced choice provision and the primary eve filing deadline remained. However, in that year 4 minor party candidates succeeded in having their names placed on the ballot: two for the state legislature; one for the United States House of Representatives; and one for the United States Senate (J.A. 86).

9. As a result of the decision in Anderson v. Celebrezze, the June primary eve filing deadline was suspended. All candidates, therefore, had until August to file nominating certificates. Three minor party candidates for president were given access to the ballot for the 1984 election and one minor party candidate appeared on the ballot for United States Senate. No independent or minor party candidates were placed on the ballot for the state legislature or other statewide offices that year, however. (J.A. 86-87).

10. In 1985, the legislature changed the primary date from the first Tuesday in June to the second Tuesday in May, where it remains today. There were other legisla-

10

tive changes in 1985 and 1986; however, in the period between the last legislative changes in 1986 through the date of the district court's decision in March 1995, there were four elections. <u>Three independent or minor party candidates for president</u> gained access to the ballot, one in 1988 and two in 1992. In 1986 and 1988, <u>no independent or minor party candidate, however, appeared on the general election ballot</u> as a nominee for either the <u>state legislature</u>, a <u>statewide office</u> or <u>United States Congress</u>. In 1990 and in 1992, there was one independent candidate for the state legislature. A second independent candidate for the state legislature qualified in 1992 but withdrew for unknown reasons. A third independent candidate paid the filing fee for state senate but did not appear on the ballot. (J.A. 88-89).

In sum, in the many elections since 1937 in which a spring filing deadline was in effect, only four candidates for president and vice-president and eight candidates for state offices have been successful in gaining access to the ballot. Of the eight candidates who did obtain access to the ballot for state office, only one was running for a statewide office. (J.A. 48-51, ¶¶ 33-44).

Based on this historical data and the legislative changes made over time, the district court concluded that "the almost total lack of independent and minor party candidates on the general election ballots in the period between 1938 and 1980 was attributable to external forces." On the other hand, the district court concluded that "[t]he data starting in 1984 thus suggests that a May filing deadline imposes some burden on independent and minor party candidates" (J.A. 94) and that:

> [i]t may similarly be said that the prohibition against both signing a nominating certificate and voting in the primary hindered the ability of the Libertarian Party to garner the signatures necessary for Hess by the May primary eve filing deadline [in 1992]. It is reasonable to assume that many voters are reluctant to forego voting in the primary, particularly when the primary may be the decisive race for certain

11

offices and their decision must in many instances be made before the positions of the major political party candidates are crystallized.

(J.A. 94). Then, in comparing signatures obtained by the Libertarian Party before the May 1992 primary and afterward, the district court reached the conclusion that "it follows that the forced choice provision appears to have hindered his [Hess'] ability to gain access to the ballot [in 1992]." (J.A. 94-95).

Finally, the district court concluded, once again on the basis of historical statistics and the history of changes in state election law, that "it cannot be said that under the current statutory framework, it is only rarely that an independent or minor party candidate succeeds in getting on the ballot when forced to meet a May primary eve filing deadline." (J.A. 93).

Notwithstanding the thoughtful analysis of the legislative evolution and historical data conducted by the district court, I am forced to conclude that the historical, statistical information since 1944, and particularly in the last decade, points strongly to the conclusion that West Virginia's restrictions on ballot access results in a severe restriction and, more to the point, that the principal impediment to access is the combined effect of the primary eve filing deadline and the forced choice provision because, when those provisions have been absent, third party and independent candidates have achieved a measure of success in obtaining access to the ballot not demonstrated while those restrictions were in effect.[2]

Indeed, a fair summary of the historical and statistical evidence, especially since 1984, is that, except when the ballot access provisions here challenged have been suspended or do not apply (as in the case of presidential elections), there have been no third party or independent candidates on West Virginia's ballot for state offices and

_____

[2] The district court correctly concluded, contrary to the assertion of the Secretary of State, that the decision of this Court in Socialist Workers Party v. Hechler, 890 F.2d 1303 (4th Cir. 1989), does not control the facts presented by this case because the plaintiffs here presented a factual record not before the Court in Socialist Workers Party.

12

only a scant few for congressional offices. Further, third party and independent candidates in presidential elections achieved ballot access when those measures were suspended and have enjoyed regular access in the elections since the filing date for petitions in presidential elections was moved to August.

Additionally, there is substantial evidence of a non-historical, non-statistical nature which demonstrates that the ballot access provisions here challenged have had, and continue to have, a severe effect. For example, the undisputed evidence is that West Virginia is the only state which combines primary eve filing with a forced choice provision. Also, the expert evidence of Richard Winger (stipulated by the parties as an expert who edits the publication entitled "Ballot Access News" and serves as a consultant on federal and state election law) recites that West Virginia's ballot access laws make it the most inaccessible state in the country for third party and independent candidates. He also testified that, during the period of 1944 through the date of his affidavit, "no other state has had as few third party or independent candidates on the ballot for state office or for Congress as West Virginia." Finally, William Redpath, the Nationwide Ballot Access Chair for the Libertarian Party, testified that, in his experience, West Virginia was the most difficult state in the country in which to qualify candidates for state offices. He demonstrated the truth of this assertion by showing the favorable results his party achieved in other states without the unique combination of restrictions here at issue.

This non-historical, non-statistical evidence appears not to have been taken into account in assessing the severity of the challenged ballot access restriction. That evidence, however, assumes particular importance in this case because, as noted previously in footnote 1, the records which would show the pool of third party and independent aspirants who did not achieve ballot access over the years had been destroyed and was not available for comparison with the data demonstrating the dearth of third party and independent candidates. It is difficult, therefore, to ascribe dispositive significance to the statistical evidence related to that period. Moreover, the heart of the data upon which the district court's opinion relies, namely, the relative success which third party and independent candidates had in accessing the ballot in 1932-1936, is relatively antiquated. Thus, the more contem-

13

porary analysis, manifested in the evidence given by these individuals, should be given credence.

Nor is it persuasive that the number of third party and independent candidates who achieved ballot access decreased from four in 1982 to one in 1984 when the primary eve deadline was moved to August because of the decision in Anderson. This decrease is not significant because the number of third-party and independent candidates in both of those years was so small in absolute terms when compared to the large number of possible statewide offices. Furthermore, considering the history of adversity encountered by third parties reflected in the record, I cannot take much comfort in positing that the one time suspension of the early deadline in 1984 should have produced more candidates than it actually did.

I respectfully submit that the effect of the historical, statistical data considered in perspective of the foregoing expert and first-hand evidence is sufficient to establish the existence of a severe restriction on ballot access, thereby necessitating the showing of a compelling state interest which, as discussed later, the state has not demonstrated.

At a minimum, the plaintiffs' evidence was sufficient to shift the burden of going forward on the issue of severity to the Secretary of State, who failed to offer evidence to rebut the plaintiffs' demonstration of severity, relying instead on speculative assertions that the admitted dearth of third party and independent candidates on West Virginia's ballots, over a protracted period of time, was caused by other factors such as the general lack of interest in third parties during and after the Roosevelt era, the dominance of the Democratic Party in West Virginia, and the effect of various legislative changes. Considering the admonition of the Supreme Court in Anderson v. Celebrezze, that a court confronted with constitutional challenges to specific provisions of the state's election law"must resolve such a challenge by an analytical process that parallels its work in ordinary litigation," it cannot be said that the assertions made by the Secretary of State satisfies his obligation to meet the plaintiffs' proof with proof under the familiar, now settled, principles of current summary judgment jurisprudence.[3]

_____

3 **Anderson v. Liberty Lobby, Inc.** , 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

14

It also appears that the severity analysis was heavily influenced by the conclusion that "the Libertarian Party's own lack of diligence contributed to its failure to meet the May filing deadline." (J.A. 95). That conclusion, in turn, appears to be based:

>(1) on the fact that the initial coordinator for the Libertarian Party's pre-May petition drive had no previous experience;

>(2) on the fact that 23% of the petitions submitted in May were invalidated as the result of a settlement agreement between the Libertarian Party and the Secretary of State respecting the alleged failure of the party's solicitors to inform individuals from whom they solicited signatures, in accordance with state law, that they could not sign the petition and vote in the primary; and

>(3) on the view that the Libertarian Party experienced an unsatisfactory validation rate compared to other candidates.

To the extent that the lack of diligence rationale is predicated on the inexperience of Horton, I respectfully submit that inexperience is not a lack of diligence. To the extent that the lack of diligence rationale is based on the results of the settlement agreement, I respectfully submit that the record is too insubstantial to permit an inference of non-diligence from the mere fact of settlement of a dispute over whether certain information was or was not given by the party's solicitors. To the extent that inadequate diligence is founded on the assessment that the Libertarian Party's validation rate was 30% to 40% lower than any group other than the Socialist Workers Party, I respectfully submit that it is without significance because, as the plaintiffs point out, the only other statewide petitioning effort in the 1992 election, which was more successful than the Libertarians, was that of Ross Perot who was placed on the ballot as a presidential candidate and those petitions were not due until August.

However, there is a more fundamental difficulty with the reliance on the plaintiffs' purported lack of diligence in assessing the severity of the ballot restrictions. The concept of a "reasonably diligent candi-

15

date" comes from language in <u>Storer v. Brown</u>, where, in preface to its articulation of the requirements for assessing the severity of the state restriction, the Supreme Court explained that the inevitable judgment in ballot access cases was whether a reasonably diligent independent candidate could be expected to satisfy the challenged requirements. <u>Storer v. Brown</u>, 415 U.S. at 742. That statement simply establishes an objective standard against which to assess what could be achieved in the face of the ballot access restrictions at issue in a particular case. It does not, I respectfully submit, permit the use of a subjective standard in conducting the severity analysis because a lack of reasonable diligence would permit even the most egregious restrictions to survive and that is not, I think, what <u>Storer</u> intended. Nor is it consistent with the Court's instruction that the primary concern in ballot access cases is the rights of the voter because a heavy focus on a specific candidate's actual diligence precludes or, at least distorts, the inquiry on the primary concern that permits consideration of a candidate's diligence only in an objective sense.**4**

Moreover, to consider the "reasonably diligent candidate" language in <u>Storer</u> as the ultimate determining factor, or even as a significant determining factor in the severity analysis, is to overlook the critical question which is whether independent or third party candidates have qualified with some regularity. As the Supreme Court directed in both <u>Storer v. Brown</u> and <u>Mandel v. Bradley</u>, that is the critical inquiry. Here, the record demonstrates convincingly that third party and independent candidates have not qualified with regularity, but have met with some of the greatest lack of success in the country. That, at a minimum, suggests that Horton's inexperience had little, if anything, to do with the matter. Nor, is there merit to the contention of the Secretary of State that lack of diligence before the primary is proved by the fact that post-primary solicitations produced the requisite number of signatures in only two weeks. To the contrary, that only goes to show that it is easier to obtain signatures after the primary.

Finally, the severity analysis was based, in significant part, on the conclusion that there were several causes for the dearth of third party

_____

**4** That is not to say that a lack of diligence is always irrelevant. <u>See</u> <u>Socialist Worker's Party v. Heckler</u>, 890 F.2d 1303 (4th Cir. 1989). Those circumstances are not present here, however.

16

and independent candidates in addition to the combined effect of the primary eve filing deadline and the forced choice provision. The analysis seems to proceed from the premise that severity will obtain only where the challenged restrictions are solely responsible for the lack of ballot access. (J.A. 91-92). This approach, however, shifted the focus of decision to the question of causation in a way that required the plaintiffs to show that the principal, if not the sole, cause of the demonstrated dearth was the challenged provisions.

That approach, however, is inconsistent with the requirements of Anderson and Burdick because it requires more than the showing of a severe burden. Here, the undisputed record shows a lack of success, almost unique in the country. And, the plaintiffs produced substantial statistical evidence that the dismal showing took place when the challenged provisions were in effect, while showing also that the success factor was significantly different when the challenged restrictions did not apply (either by actual suspension or generally in the case of presidential elections). They also produced opinion evidence from Winger and Redpath that the disparate effect was produced by the challenged provisions. That, I respectfully submit, is sufficient to prove a severe burden.

B. The Asserted State Interests In Maintaining The Challenged Restrictions

The second part of the analysis requires assessment of West Virginia's asserted interests in maintaining the May filing deadline. The three justifications offered to support the need for that deadline fail to justify it, under either the "important" state interest analysis which was followed by the district court, or under the "strict scrutiny" standard which, for the reasons set forth in Part A above, is warranted by the severity of the burden those restrictions impose.

In making the required determination, the court must first "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Anderson, 460 U.S. at 789. After identifying those interests, "the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." Id. (emphasis added).

17

Under this standard, the rigorousness of the court's inquiry into the propriety of the state's restriction turns upon the extent of the burden placed upon a reasonably diligent candidate's ability to gain access to the ballot. Burdick, 112 S. Ct. at 2059. Where an election law places a severe burden on a reasonably diligent candidate's access to the ballot, the regulation must be "narrowly drawn to advance a state interest of compelling importance." Id. However, even where the regulation "imposes only reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters to choose their candidate, the state must still demonstrate that it has "important" regulatory interests sufficient to justify the restrictions. Id. Finally, even where a state interest is shown, whether compelling or important, the restriction must not be unnecessarily restrictive. Anderson v. Celebrezze, 460 U.S. at 806.

1. Ensuring A Modicum Of Support

First, the primary eve filing deadline has been justified on the ground that it insures that candidates on the election ballot have demonstrated at least "a modicum of support." That interest, of course, has been identified by the Supreme Court as the fundamental interest which any state has in promulgating regulations that govern the administration of elections. As the Court explained:

> the State has the undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with the names of frivolous candidates.

Anderson, 460 U.S. at 788 n.9 (citations omitted).

While the May 1 filing deadline may contribute in some way to ensure that third-party and independent candidates demonstrate a showing of support before the state permits their appearance on the ballot, the restriction cannot be said to be either "necessary" or "narrowly tailored" to serve this interest. Since 1984 when Anderson was decided, West Virginia has operated successfully under a requirement that third party and independent presidential candidates must file petitions on August 1. History shows that this has adequately served the

18

state's interest in avoiding a ballot "encumbered" by insignificant candidates. The state has neither asserted otherwise nor offered any reason why an August 1 deadline would not equally serve the state's interest in requiring state candidates to show a"modicum of support." Under such a circumstance, the Supreme Court has admonished that:

> [E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."

Anderson, 460 U.S. at 806 (citations omitted). Accordingly, where, as here, there are two approaches which equally serve the legitimate interests of the state, and one of those methods is less burdensome upon the exercise of a basic constitutional right, the more burdensome approach, if adopted by the state, is not constitutionally permissible.

2. Equal Treatment

Second, the May filing deadline has been justified on the ground that it serves to place all candidates upon "equal footing" by equally exposing them to the scrutiny of the public eye and to negative campaigns put forth by other candidates who emerge from the May primaries. While the state may have an interest in promoting such equal treatment, reliance on the May 1 filing date to achieve that end is substantially undercut by other provisions of West Virginia's code which effectively serve that interest without impermissibly burdening the plaintiffs as does the May 1 deadline. West Virginia Code § 3-5-23(a) provides:

> Group of citizens having no party organization may nominate candidates for public office otherwise than by conventions or primary elections. In such case, the candidate or candidates, jointly or severally, shall file a declaration with the secretary of state if the office is to be filled by the voters of more than one county, or with the clerk of the circuit court of the county if the office is to be filled by the voters of one county or political subdivision thereof; such declaration to filed at least thirty days prior to the time of filing the

19

certitificate provided by section twenty four #AD8E # 3-5-24] of this article.

(Emphasis added.) As a consequence of this section, potential third party and independent candidates must step into the public forum well before the May primary and, although it is not certain that they will ultimately appear on the ballot, they will, nevertheless, be known as potential candidates by the public, the media, and their adversaries. Thus, any supposed strategic advantages which may inure to third party or independent candidates as a result of the institution of a deadline after the May primary, are eliminated by virtue of the equally effective, but far less restrictive, statutory control present in § 3-5-23 which already serves to foreclose those potential problems. Moreover, there has been no showing that the August date for filing in presidential elections has resulted in the adverse consequences apprehended, but not shown, by the state.

3. Voter Education

Finally, the May filing deadline also has been held out to serve the state interest in ensuring that voters are in a position to cast their ballot in an informed and intelligent manner. "There can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election." Anderson, 460 U.S. at 796. However, for the reasons set forth above, it would appear that an individual's declaration of candidacy under § 3-5-23 would still serve to let the public know of the individual's intent to run and would provide to voters an adequate opportunity to thoughtfully consider the candidate's views and thereby cast an informed vote even if the filing deadline for petitions in non-presidential elections was moved to August.

Furthermore, the Supreme Court has recognized that the effect of the drastic changes in communications technology, the literacy rate, and the degree to which citizens are informed about events and issues lessen the need for the state to provide broad protections to ensure voter education. Anderson, 460 U.S. at 796-97 Indeed, in Dunn v. Blumstein, 405 U.S. 330, 358 (1982) the Court rejected the rationale posited by the state to justify a statute requiring residence in the state

20

for a year and in the county for three months as a prerequisite to voter registration because:

> Given modern communications, and given the clear indication that campaign spending and <u>voter education occur largely during the month before an election</u>, the State cannot seriously maintain that it is `necessary' to reside for a year in the State and three months in the county in order to be knowledgeable about congressional, state, or even purely local elections.

(Emphasis added.) The recent decision of this Court in <u>Cromer v. South Carolina</u>, 917 F.2d 819 (4th Cir. 1990), reinforces this view. There, the Court held that while "no constitutional maximum or minimum has been developed," a decent interval for voter education is about 60 to 90 days before a general election. <u>Id.</u> at 825. "Beyond that period, some other interest would seem to be needed to justify an earlier declaration of independent candidacy." <u>Id.</u>

Here, the state has failed to offer any reason why the period from August to November is insufficient to allow voters to learn about the candidates and to cast a vote on an informed basis. Consequently, in light of both Supreme Court precedent and this Court's decision in <u>Cromer</u>, this justification for the May filing deadline fails to outweigh the constitutional burden it creates. Hence, it is constitutionally impermissible.

For the foregoing reasons, I would strike the challenged provisions of West Virginia's ballot access restriction law.

21